[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties were married on October 9, 1994. It was a first marriage for both. No children were born to the wife during it. The parties had dated and lived together for a substantial period of time prior to the marriage. They have been, in essence, living separate and apart since the service of the complaint in August 2000. CT Page 2389
The wife is 39 years of age. She describes her health as generally good except for some allergies. She has four years of post high school schooling but is shy a number of credits toward a bachelor's degree. She has been employed steadily throughout the marriage except for a very brief period during 1998 when she was unemployed. Prior to her present job, she had an equally brief period where she had a couple of substantially lower paying jobs. Currently, she is the merchandising manager for Federated Merchandising and earns a base salary of $125,000. She is eligible for a bonus and, in fact, received a $20,000 bonus in the year 2001 for the previous year. She indicated to the court that the bonus is dependent upon the company and the employee making certain goals which will not be met this year. Therefore, she does not anticipate a bonus this coming spring. She carries health insurance for herself and the husband, and she participates in the pension and is not vested as of this date.
The husband is 44 years of age. He has a Bachelor of Arts from Sarah Lawrence College with a degree in Fine Art and Developmental Psychology. He also indicated that he had taken some computer courses and received a certificate of completion. He was also employed at the time of the marriage and for the first four years thereof. At that time he was retail director for Coach, a division of Sara Lee. He was earning approximately $118,000 a year in June of 1998 when he and his entire department were let go. He made some initial efforts to seek similar employment and in fact prepared a resume. However, he ultimately chose not to seek such employment. Currently he lives in and operates a guest house in Newport, Rhode Island, while he tries to build up a contacting business for which he performs light, finished carpentry. He describes his health as generally good, however, he has had a series of health problems including a hiatal hernia, a hearing loss, skin cancer and the removal of a gland in his neck. However, he did indicate through his testimony that this "has not impacted his earning a living."
There are several assets of the marriage which are in dispute. First and foremost is the home at 24 Vanderbilt Avenue, Rowayton, Connecticut. This house was purchased in the husband's name in May 1992 prior to the marriage. The purchase price was $260,000. According to the husband's testimony, which was undisputed by the wife, the house was purchased by means of a mortgage and his contribution of approximately $100,000. The original mortgage was $145,000, however, during the course of the current proceedings, the husband applied approximately $100,000 from a combination of his severance and the proceeds from the refund of his boat purchase to reduce the first mortgage to approximately $40,000. There is a second mortgage in the form of a home equity line having a balance of approximately $90,000 to $95,000. According to the husband's testimony, on CT Page 2390 the day that the action was commenced this balance was approximately $60,000 to $65,000, and that he has used the difference to pay some of his expenses. There was a minor dispute with regard to the valuation of the house. The wife on her affidavit indicates that the house is worth $489,000, while the husband has indicated that it is worth $500,000. Shortly before the marriage the house was listed for sale and, in fact, a contract of sale was entered into. This was later rescinded by virtue of a court order obtained by the wife subsequent to the filing of the papers. The closing had originally been scheduled for September 8, 2000.
According to the testimony of the wife, the husband has spent very little time in the Rowayton house subsequent to the divorce and spends most of his time in Newport. A major source of contention between the parties arose when the wife later moved her 90 plus-year-old grandmother and great-aunt into the Rowayton house in December of 2000. The wife indicated that despite the fact that the title of the house was in the husband's name alone, they always referred to it as "our house." She said that at the time of its purchase they had a verbal understanding that she would make regular monthly contributions to it, and that she would pay for the wedding. The wife testified at length both directly and on cross examination with regard to approximately $30,000 spent on the wedding including the reception, etc. On cross examination, however, she did admit that the husband and/or his family contributed a substantial amount also in the form of gifts to the couple and a rehearsal dinner. Both parties contributed to the Hawaiian honeymoon.
Another major family asset is the real estate located at 42 Pope Street Newport, Rhode Island. Again, title is also in the husband's name along with a partner, as is a mortgage. The value of the house is in serious contention. Both parties have provided through testimony and appraisal reports with values that range from $280,000 to $330,000. The property was purchased for $142,500 with a $128,500 mortgage. The husband has subsequently refinanced the mortgage which now stands at approximately $160,000. The parties basically renovated an old two family home in Newport and converted it to a guest house. According to the testimony of both parties, it had been planned that they would retire to Newport and operate it as a bed and breakfast. The intervening divorce has changed things. In the year 2000 the house was rented for the summer, however, in September of 2000 the husband began to rent it out on a nightly basis as a guest home. He earns approximately $20,000 a year gross, however, this does not cover the mortgage, taxes and other expenses. It is interesting to note that while the husband has a business partner who is entitled to one-half of the equity, the permit for the guest house is in the name of both the husband and the wife. There was testimony that the renovations amounted to between $45,000-$50,000. CT Page 2391
The husband had a motor boat prior to marriage but bought a new one during the marriage the cost was approximately $106,000 financed chiefly by a $90,000 mortgage. The boat was defective and the husband sold it back to the manufacturer and received approximately $26,000 which he placed in his bank account. It is also interesting to note that the wife testified that this $26,000 deposit came from her severance package, but the evidence indicates otherwise. In addition, the husband had a joint fidelity account with his mother which at the time of the dissolution had approximately $50,000 in it. The husband transferred his interest in the fidelity account back to his mother, apparently at her request, citing as justification therefor, the support that his family had given him with regard to legal fees. The court is somewhat skeptical with regard to the motivation. The husband testified that the monies were his mother's alone and that only she had the right to draw on that account. The court asked the defendant whether or not it was payable to him upon the death of his mother, and he indicated that he believed that it was. The court believes that the transfer was to avoid any claim to this asset by the wife. The husband also had a 401K which he cashed in for expenses and in addition, had three IRAs, only one of which was acquired during the marriage. He has life insurance, however, in August or September of 2001 he withdrew the cash value in his policy amounting to $13,500. He also indicated he had a Morgan Stanley account which he had before the marriage from which he withdrew $26,000 to cover expenses. He gave his wife an engagement ring which she still has, the value of which in 1994 was between $6,000-$7,000, and which is undoubtedly worth considerably more, although no credible evidence was introduced to substantiate its current fair market value.
The wife had an interest in a home in Westport which was owned by her late father. (Her mother is currently in a nursing home.) The proceeds from the sale of that home were divided three ways between the plaintiff and her two brothers.
Considerable time was spent regarding a pre-nuptial agreement which was executed by the parties. The husband has asked the court to enforce the agreement, while the wife has asked the court to find it to be void. In short, after a course of negotiations running from approximately April through August of 1994, throughout which period both parties were represented by counsel, on the day before the wedding, the husband presented the wife with a final draft of the agreement with changes and an ultimatum to sign or else the wedding would not take place. The signing took place at 5:30 p.m. following a very contentious meeting of the parties in a car in front of a Mailbox's office. During the meeting, many notations were made on the document and many paragraphs were eliminated mostly in red ink. Neither party had the opportunity to discuss these changes with their respective attorneys. The wife indicated that she did CT Page 2392 not understand and did not agree with all of the terms, but she "did not want any bad feelings" before the wedding. The husband indicated that he had been trying to get the wife to focus on the changes for some time but that she would not discuss or sign them. The wife further testified that she thought the only purpose of the pre-nuptial agreement was to preserve the husband's inheritance, however, the agreement as finally drafted was much more comprehensive, and included the Rowayton house. The plaintiff called as a witness Attorney Kevin Collins who drafted the agreement and represented the husband throughout the proceedings. Attorney Collins gave very straight forward and detailed testimony with regard to the chronology. However, he did admit that the final draft was sent to the wife's attorney, that just prior to the wedding the husband had picked up a copy, and that he did not talk to the other attorney prior to the parties execution of the document. He also indicated through testimony and through other evidence that the wife's attorney had indicated that she wanted to review the final changes prior to her client signing the proffered agreement. Mr. Keefer circumvented this process at the last minute and took matters into his own hands.
Another major source of the conflict occurred when the plaintiff moved her aging relatives into the premises shortly after the filing of the divorce. She indicated that while her brother lived locally and had a home, where there was apparently some room for them, her grandmother and aunt indicated that they wanted to live with her. Together, they pay her the sum of $462 a week. At first the plaintiff characterized this as a gift, however, it is apparent that it is a form of rent. of some concern to the court in terms of the plaintiffs credibility was the fact that she testified that she does virtually nothing about these two persons' finances for whom she is ostensibly caring.
Thoroughout the marriage the husband had paid all of the bills after applying his income and the wife's contribution. After he lost his job he was concerned with the family's cash flow and confronted the wife with regard to the use of her credit cards. He testified that she admitted to approximately $12,000 in outstanding balances, which he later found was actually $24,000 in card charges. He testified that he took control over of the payment of the sums. The wife countered through testimony that she needs to buy a lot of clothes because it is important for her job. She also indicated that during this period of time the husband drank way too much and was using marijuana. Furthermore, she indicated that she had problems with the husband's family right from the beginning. She indicated that her multiracial background was a source of hostility from his family. In fact, she contends that she was ostracized by them, a charge the husband denies. As an example, while the husband was invited to his parents' 50th anniversary celebration, she was not. She indicated that they virtually never came to her home; she was not invited to their CT Page 2393 home. She also said that the husband told her that he was being disinherited by them again because of her race. When he was drinking heavily, he threw things at her and used racial epithets. Finally another source of problems involved their attempts to have children. She indicated that they had a normal marital relationship from 1994 to 1995. After he lost his job, she indicated that he said he didn't want any children. She said that she "was devastated" and had to consult a therapist. She asked him to also join in the counseling, but he refused. The court found this testimony to be convincing and compelling.
To say that this was a contested matter would be an understatement. Throughout the six-day trial the court noted a palpable hostility by and between the parties. Neither party impressed the court with their candor, rather, each clung tenaciously to their own version of the "truth" as they contested for the "mind and heart" of the court. The court is reminded of the oft-quoted saying that the "first casualty when war comes is truth."[1] The only time when there was any levity between the two of them was when a question was asked of the wife about cooking, and each spontaneously and simultaneously laughed. Sadly, that was the only glimpse of what likely was of the joy of their former relationship and a glimmer of what might have been.
 FINDINGS
The Court, having heard the testimony of both parties, and having considered the evidence presented at hearing, as well as the factors enumerated in Sections 46b-40, 46b-51, 46b-62, 46b-63, 46b-81, and 46b-82
of the Connecticut General Statutes, hereby makes the following findings:
1. That it has jurisdiction.
2. That the allegations of the complaint are proven and true.
 3. That the marriage of the parties has broken down irretrievably, and that ample evidence exists that both parties have contributed to said breakdown, however, the court assigns significant weight to the husband's unilateral decision not to have children and to the devastating emotional impact of said decision upon the wife who is approaching the latter stages of her normal child bearing years.
4. That at the time of the marriage, the husband was gainfully employed, and as late as June 1998 he was earning approximately $118,000 base salary per annum; CT Page 2394 that during the marriage, the husband was terminated from his employment, which termination was involuntary; that the husband has made no significant effort to regain employment similar thereto; that the husband has voluntarily chosen to start a contracting business and to renovate and run a guest house in Newport, Rhode Island property; that while the present earnings from his efforts are modest, the court takes judicial notice of the fact that Newport is a popular weekend/vacation destination, and that with a greater effort on his part than he has put forth to date, the long term financial prospects for his enterprises are excellent.
 5. That at the time of the marriage and virtually throughout same, the wife has been gainfully employed, earning at present $125,000 base salary per annum.
 6. That each party has the ability and means to support themselves; and that it is equitable and appropriate that no alimony be awarded to either party.
 7. That the parties entered into a pre-nuptial agreement dated October 8, 1994; that the evidence before the court supports the wife's claim that the version as presented to her on the eve of the wedding went beyond the scope of her original contemplation, and that she entered into it under duress and without adequate opportunity to consult with her attorney; and that therefore it is voidable and would be inequitable to enforce same. McHugh v. McHugh, 181 Conn. 482
(1980).
8. That in May 1992, prior to the marriage, but while the parties were living together, the husband purchased the premises known as 24 Vanderbilt Avenue, Rowayton, Connecticut, for the sum of $260,000; that the purchase was funded by a $100,000 down payment by the husband as a gift from his parents and a mortgage in the amount of $160,000; that title was placed and remained in the husband's name; that during the marriage, each party contributed to the maintenance and upkeep of the premises; that the wife had a good faith belief that she had an equitable interest in the CT Page 2395 premises; that during the marriage, the husband reduced the mortgage by the payment of approximately $100,000 from his severance package and sale proceeds from his boat leaving a present balance of approximately $40,000; that in addition to the first mortgage, there is at present a home equity line of approximately $95,000 some of which was used by the husband for living expenses; that the fair market value of the property is $500,000; that there is approximately $365,000 in equity; that the premises is the principal residence of the wife who has been largely responsible for its maintenance; that the court finds this asset to be marital property; and that it is equitable and appropriate that in the division of this asset, the court take into consideration, in whole or in part, the husband's contributions to the purchase of the property, the pay down of the first mortgage principal, and his borrowing against the home equity line and use of same.
 9. That prior to the filing of the present action, the husband listed said property for sale and obtained a signed contract to purchase same from a third party in an arm's length transaction; that prior to the closing of title, the wife filed the present action and obtained a court order enjoining the transaction; that shortly thereafter, the wife brought her grandmother and great-aunt (both of whom are in their 90's) to live with her; that while the wife's actions may have had an altruistic motive in part, they were in large measure calculated to secure her claim to the Rowayton real property.
10. That in May 1994 the husband, together with one Matthew Bollo, purchased the premises known as 42 Pope Street, Newport, Rhode Island, for the sum of $142,500; that the purchase was funded with cash in the amount of $14,250 and a mortgage in the amount of approximately $128,250; that the husband and wife agreed to renovate the premise and operate same as a guest house together, but that the present action has changed these plans; that the title to same was placed and remains in the name of the husband and Matthew Bollo; that the husband made substantial renovations himself or by other contractors, payment for which CT Page 2396 came from additional borrowing in the form of a refinance in the amount of $160,000 and mortgage advances from Mr. Bollo; that the husband spends most of the week at the Newport premises, which is both his principal residence and means of support; that the wife made some modest contribution toward the decorating of same, but the premises are supported almost entirely by the husband's efforts; that the premises has a current fair market value of $325,000; and that the net value of the husband's one-half share is approximately $82,500.
 11. That at the time of the marriage, the husband owned a power boat; that during the marriage, the husband sold and replaced same with another boat; that the new purchase was financed by the proceeds from the prior sale and a mortgage; that the husband subsequently returned the boat to the manufacturer due to a defect and received a refund of approximately $26,000; that the wife made no contribution to the acquisition, maintenance, or preservation of this asset; and that it is equitable and appropriate that the court take this into account in the division of assets.
 12. That at the commencement of this action, the husband had an interest in a Fidelity Fund account with his mother having a then balance of approximately $50,000; that subsequent thereto, in contravention of the automatic orders set forth in Practice Book § 25-5, he transferred his interest to the sole name of his mother in order to protect it from any claims by the wife; that the source of the funds was the husband's mother who also had control of same; and that the wife made no contribution to the acquisition, maintenance, or preservation of this asset; that the testimony of the husband indicated that the monies were held for his benefit to be payable upon his mother's death; and that it is equitable and appropriate for the court to take this asset into account when entering its financial orders.
13. That during the pendency of this action, the husband has disposed of and/or depleted certain other assets, in contravention of the automatic orders set CT Page 2397 forth in Practice Book § 25-5, including a Morgan Stanley account, a Fidelity IRA, and a 9-West Group 401(k) plan; and that it is equitable and appropriate for the court to take these assets into account when entering its financial orders.
 14. That the wife has received stock options from and currently participates in a 401(k) plan and a pension plan through her present employer, Federated Merchandising Group; that said assets are marital assets; that the husband's contribution to same has been de minimus; and that it is equitable and appropriate that the wives retain these assets free and clear of any claims by the husband.
 15. That prior to and during the marriage the wife incurred considerable credit card debt, in large measure for her own benefit; that said debt was incurred in part during a time when one or both of the parties were unemployed; that the debt placed considerable strain upon the marriage; that the court found the husband's testimony in this regard to be more credible; and that it is equitable and appropriate that the wife be responsible for the current balance of the credit debt as shown on her financial affidavit.
 16. That in 1994 the husband gave the wife an engagement ring having a then current fair market value of $6,000 to $7,000; and that under all the circumstances, it is equitable and appropriate that the wife should retain same free and clear of any claims by the husband.
17. That each of the parties has incurred in excess of $50,000 in attorneys fees and costs in the present action; that given the relatively short duration of the marriage, the fact that there are no minor children, and the relatively simple nature of the marital assets, these sums are in inverse proportion to the complexity of the case and directly related to the heat of their battle; that each has ample assets and earning capacity to make arrangements with their respective counsel for the payment of these fees; and that it is equitable and appropriate that each party pay their own legal fees and costs incurred herein. CT Page 2398
 ORDER
IT IS HEREBY ORDERED THAT:
 1. The marriage is hereby dissolved and the parties are each free to remarry.
2. No alimony is awarded to either party.
3. As to the real estate at 24 Vanderbilt Avenue, Rowayton, Connecticut, within thirty (30) days from the date hereof, the husband shall convey his interest therein to the wife by means of a fully-executed Quit Claim Deed along with completed Conveyance Tax Forms. Thereafter, the wife shall have exclusive possession of the real estate, subject to the existing indebtedness, and she shall be responsible for the payment of all mortgages, liens, taxes, and insurance, and shall indemnify and hold the husband harmless from any further liability thereunder. The husband shall vacate the premises within two (2) weeks from the date of this order. The wife shall pay to the husband a lump sum in the amount of TWO HUNDRED TWENTY-FIVE THOUSAND AND NO/100 DOLLARS ($225,000.00) as follows: Commencing March 1, 2002, and monthly thereafter, the sum of $1,000 until such time as the lump sum shall be paid in full, with the balance (after credit for the total of the monthly payments made) payable upon the sale or other transfer of title to the property (or any portion of it), a refinance of the existing mortgage and/or home equity line or the obtaining of new or additional financing so that the aggregate the new indebtedness on the property does not exceed $150,000 exclusive of the debt to the husband, or five (5) years from the date of this Memorandum of Decision, whichever shall sooner occur. The wife shall execute a simple Promissory Note to the husband containing the usual language regarding the payment of reasonable attorneys fees and costs in the event of her default, and which shall not bear interest if paid on or before the end of such five (5) year period, but which will carry simple interest at the rate of eight (8%) percent per annum thereafter until paid in full. Said Promissory Note shall be secured by a mortgage deed. Both the deed and note CT Page 2399 shall be executed simultaneously with the delivery of the Quit Claim Deed to the husband. The husband shall subordinate his mortgage to any future refinance by the wife but only to the extent any indebtedness taking precedence over his lien shall not exceed $150,000. The wife shall use her best efforts to refinance the existing mortgage/home equity line and/or otherwise eliminate any obligations of the husband thereunder within one (1) year from the date of this Memorandum of Decision. In the event that the wife fails to do so for any reason, unless the husband shall consent to an extension, the property shall be immediately listed for sale. The court shall retain jurisdiction to decide any issues that may arise regarding the implementation of the terms of this paragraph, including but not limited to the listing and sale of the premises. Payments to the husband hereunder shall be nontaxable to him and not deductible by the wife. The husband shall not further encumber the property beyond the balance as shown on his financial affidavit dated October 23, 2001, as on file with the court. The provisions of the foregoing paragraph shall be nonmodifiable, except by written agreement of the parties.
 4. The husband shall have exclusive possession of the real property located at 42 Pope Street, Newport, Rhode Island, and he shall retain title to the same free and clear of any claims of the wife, subject to any existing mortgages and liens thereon.
5. Personal property shall be divided as follows:
 A. The home furnishings at the Rowayton premises shall be divided as nearly equally as possible. In the event that the parties are unable to agree upon a division, the issue is hereby referred to Family Relations for resolution and recommendation. The husband shall retain title to the furnishings and equipment located at 42 Pope Street, Newport, free and clear of any claims by the wife.
B. Each party shall be entitled to keep the automobile which they are currently driving (whether owned or leased) free and clear of any claims by the other, and each party shall cooperate with the other CT Page 2400 regarding the execution of any documentation necessary to transfer and/or register same. Specifically, the husband shall be entitled to retain the 1990 Toyota 4Runner free and clear of any claims by the wife. Likewise, the wife shall be entitled to exclusive possession of the leased 1998 Jeep Cherokee, subject to the terms of said lease for which she shall be solely responsible and from which she shall indemnify and hold the husband harmless.
C. Miscellaneous personal property shall be divided as follows:
 (1) Engagement ring: The wife shall be entitled to retain the engagement ring free and clear of any claims by the husband.
 (2) Sears' stock: The wife shall retain the 100 shares of Sear's stock free and clear of any claims by the husband.
 (3) Retirement (wife): The wife shall retain her Fidelity IRA/401(k) rollover account, her Fleet IRA
rollover, her Federated 401(k) Plan, and her Federated Pension Plan free and clear of any claims by the husband.
 (4) Options: The wife shall retain her vested and unvested Federated Merchandising Group stock options free and clear of any claims by the husband.
 (5) Bank and credit union accounts: Each party shall retain the current balances in their respective checking, savings, money market, and credit union accounts free and clear of any claims by the other.
 (6) Retirement accounts (husband): The husband shall retain his Vanguard 401(k), Putnam Investments 401 (k), and the Fidelity IRA free and clear of any claims by the wife.
(7) Mutual Funds: The husband shall be entitled to retain the Fidelity investment account as well as any interest in the Fidelity account which was held by him and his mother at the time of the CT Page 2401 commencement of this action
 6. The wife shall promptly notify her employer as to the change of marital status and shall cooperate with the husband in obtaining continuation health insurance coverage as provided by state and federal law. The husband shall be responsible for the payment of any premiums due for such coverage.
 7. Except as otherwise set forth herein, the parties shall each be responsible for the debts as shown on their respective financial affidavits, and they shall indemnify and hold each other harmless from any further liability thereon.
 8. Each party shall be responsible for their respective attorney's fees and costs incurred in connection with this action.
SHAY, J.